(21 App. Div. 54.)

PROUT v. CHISOLM et al.

(Supreme Court, Appellate Division, Second Department. October 5, 1897.)

1. STOCK BROKERS—FRAUD—FICTITIOUS TRANSACTIONS.
    Where a broker receives deposits from his customer as margins to secure him against loss in buying and selling stocks under the customer's orders, it is a fraud for him to make only fictitious purchases and sales, and report them as genuine, and on discovery of the facts the customer may recover back his deposits.

2. SAME—LIABILITY TO PRINCIPAL—DEFENSES.
    It is wholly immaterial whether in fact plaintiff suffered any loss by defendant's failure to execute his orders, or whether in fact plaintiff is better or no worse off than if his orders had been executed.

3. SAME—SUFFICIENCY OF EVIDENCE.
    A complaint by a customer to recover deposits from a broker alleged that defendants had not in fact bought and sold stocks as ordered, and that the

transactions reported by defendants were purely fictitious. Defendants' books did not disclose the names of the parties from whom they bought and to whom they sold stocks, and defendants could not give such information. Defendants' business was generally transacted in the Consolidated Exchange, where stocks are, with rare exceptions, cleared through the clearing house. During a considerable period when defendants claimed to have purchased or sold, on plaintiff's account alone, 7,000 shares, it appeared that they did not clear a single share through the clearing house. Upon these and numerous similar statistics of like bearing drawn from the clearing-house records, *held*, that the conclusion was justified that the alleged transactions did not take place.

4. SAME.

To make out plaintiff's cause of action, it was not necessary to prove that every transaction was fictitious; but, if any of them were fictitious, plaintiff was entitled to have such transactions rejected from the accounts.

5. SAME—DAMAGES—EVIDENCE.

To entitle plaintiff to recover the whole sum demanded, it was not necessary that all the transactions represented by defendants' account should have been unreal; for if any of them, though real, showed a profit, they would not diminish the sum due plaintiff, but tend to increase it.

6. SAME—DUTY OF BROKER TO KEEP ACCOUNTS.

It was not true, as a matter of law, that defendants were under no legal obligation to give to plaintiff the names of the parties to whom they sold or from whom they purchased stocks, and that no presumption against the good faith or honesty of their dealings could be drawn from their omission to give such names after the 30 days during which the clearing-house sheets were preserved, or from their omission to keep a record of those with whom they dealt on plaintiff's account.

7. EVIDENCE—CLEARING-HOUSE SHEETS.

Clearing-house sheets, testified by defendants to have contained entries of transactions by them, were transmitted to the clearing house daily by the brokers who had bought or sold on the exchange. These sheets were destroyed at the end of the next month after their receipt. The clearing-house clerk who made the entries in the clearing-house books testified to their accuracy, and that he made them from the clearing-house sheets themselves. *Held*, that the records or ledgers of the clearing house were competent evidence.

8. SAME—OFFICIAL REPORTS OF CLEARING HOUSE.

Official reports of sales on the exchange are compiled by employés of the exchange, stationed on its floor to witness the purchases and sales there made, and record the same. These reports are daily published, and given to members for their information. Defendants were members, and the reports were daily posted in their office for the information and guidance of their customers. *Held*, that this constituted an admission that they were prima facie correct statements.

Appeal from trial term.

Action by William P. Prout against Alexander R. Chisolm and William F. Carey to recover money paid defendants as margins, and the value of securities deposited with them as brokers. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, HATCH, and BRADLEY, JJ.

George Putnam Smith, for appellants.

G. H. Crawford, for respondent.

CULLEN, J. The defendants were stockbrokers in the city of New York, and members of the Consolidated Exchange in that city,

upon which exchange their principal dealings were transacted. In
the years 1891 and 1892 the plaintiff was a customer of the defend-
ants, and through them speculated in stocks. During this period he
deposited with the defendants, as margins, or to secure them against
loss in fulfilling his orders, $29,000 in money, and railroad bonds of
the par value of $15,000. The transactions of the plaintiff through
the defendants' firm were very numerous. It is stated that they ap-
proximated in number to 2,000. At the end of the dealings between
the parties the defendants claimed that the plaintiff's deposit or
margin had been exhausted, and that he was indebted to them in a
large sum. The plaintiff claims that at this time he discovered that
the transactions reported to him by the defendants as made in the
fulfillment of his orders were fictitious; that as matter of fact they
neither bought stock when he ordered a purchase nor sold stock
when he ordered a sale. Thereupon he instituted this action, and
in it he sought to recover the money paid the defendants, and the
value of the securities deposited with them. The defendants an-
swered, admitting their employment by the plaintiff as brokers for
the purchase and sale of stocks. They denied that the purchases
and sales reported by them were fictitious, and alleged that, on the
contrary, they were actual. Thus the only issue in this case under
the pleadings (except a plea of another action pending, to which it
is unnecessary to refer) was whether the defendants actually ful-
filled the plaintiff's orders, or whether the sales and purchases re-
ported by them were fictitious, and in fact not made. On a pre-
vious trial of the action, at the close of the plaintiff's case the court
dismissed the complaint. On appeal the judgment entered on that
direction was reversed, and a new trial ordered. Prout v. Chisolm,
89 Hun, 108, 34 N. Y. Supp. 1066. The opinion delivered by Mr.
Justice Dykman on the prior appeal very clearly shows the nature of
the plaintiff's action, and is decisive of his right to maintain it. It
leaves but little to be added by us. The rule of law as to the duty
of an agent to his principal has been so long and so positively set-
tled that it may now be said to be elementary. The relation of an
agent to his principal is one of confidence and trust. "The principal
bargains in the employment for the exercise of disinterested skill,
diligence, and zeal of the agent for his own exclusive benefit." Story,
Ag. § 219. "Hence it is well settled that an agent employed to sell
cannot himself become the purchaser, and an agent employed to buy
cannot himself be the seller." Id. § 211. "Thus, for example, if an
agent authorized to buy should buy of himself, and the bargain is
advantageous to the principal, the latter has his election to ratify it
or not. If disadvantageous, he may affirm it or repudiate it, at his
pleasure. On the other hand, if the agent makes any profits in the
care of his agency by any concealed management, either in buying or
selling, or in other transactions on account of his principal, the
profits will belong exclusively to the latter." Id. § 214. It is,
therefore, wholly immaterial in this case whether in fact the plaintiff
suffered any loss by the failure of the defendants to execute his or-
ders, or whether, as matter of fact, the plaintiff is better, or at least
no worse, off than if his orders had been executed. A broker,

agent, or servant cannot speculate on the orders of his employer or master. There are so-called exchanges or offices in many cities in which persons assume to speculate in stocks. In these places it is understood, both by customer and banker, that stocks are not to be actually sold or purchased, but that the customer is to pay the banker or the banker pay the customer, according to the fluctuation of the market price of stocks in those exchanges where stocks are really bought and sold. But such transactions are mere gambling. They are illegal, and the maintenance of establishments where such dealings are carried on is criminal. In such cases where the dealings are fair, the persons are probably subject to no other criticism or condemnation than is to be passed on gamblers generally. But there is no pretense in this case that the plaintiff contemplated such a course of business. The defendants were members of a regular exchange, and held themselves out as carrying on a legitimate and lawful business; and the pleadings admit that they were employed by the plaintiff to effect actual purchases and sales. If, therefore, they failed to execute the plaintiff's orders in the expectation of making a profit for themselves through the fluctuation of the market, they were not only subject to condemnation as gambling, but were guilty of fraud. We think the trial court erred in speaking of this as mere legal fraud. The conduct of the defendants, if the charges made against them by the plaintiff were established, was dishonest and fraudulent, in morals as well as law. Even had they acted in good faith, and for the purpose of executing the plaintiff's orders, either sold to the plaintiff their own stock or bought from him his stock, the plaintiff would have had the right, at his election, to repudiate the transaction. It was said in Taussig v. Hart, 58 N. Y. 425:

"That transaction did not help the matter. It amounted to a sale by the plaintiffs of one hundred shares of their own stock to the defendant, which was not binding upon the defendant, for the reason that the law does not permit an agent employed to purchase to buy of himself. It is no answer that the intention was honest, and that the brokers did better for their principal by selling him their own stock than they could have done by going into the open market. The rule of law is inflexible; and, although its violation in the particular case caused no damage to the principal, he cannot be compelled to adopt the purchase. Consequently, whether the purchase of a hundred shares from Williams was for defendant's account, or the plaintiff sold to the defendant a hundred shares of their own stock, on either theory the referee was justified in rejecting that item of the account."

If this be the rule, even where a broker acts in good faith towards his principal, it applies with much greater force to a case where the broker purposely fails to execute the principal's order, and the principal, instead of having the stock ordered to be purchased, has simply the personal responsibility of the broker to make good any profits that might have accrued on the purchase had the purchase been actually effected. The matter, however, is too clear to require, or even justify, further discussion. The sole right of the defendants to retain the plaintiff's money was to pay them for their commissions on purchases or sales, and to reimburse them for losses on those dealings. If there were no such dealings, the plaintiff had the right to

reclaim his money and securities. This disposes of the question raised by the refusal of the trial court to dismiss the complaint, and also of such requests to charge as proceed on the theory that the plaintiff was entitled to recover only such sum as would have been due to him had the purchases and sales of stock been in fact made. We think the evidence sufficient to support the verdict of the jury, and that we are not warranted in disturbing that verdict.

The books of the defendants did not disclose the names of the parties from whom they bought stock or to whom they sold stock. The defendants testified that they were unable to give such information; that the only record of the parties with whom they dealt on the exchange was in the clearing-house sheets, made up each day. These clearing-house sheets, after a period of from 30 to 60 days, were destroyed. Hence it was not possible for the plaintiff to disprove the existence of any particular transaction by calling the person with whom it was said to have been made, because the name of no such person was given to him. Of course, it was also impracticable for the plaintiff to call every possible vendor or purchaser of stock to or from the defendants to impeach the accounts rendered by them to the plaintiff. He sought to establish the fictitious character of the transactions represented by the accounts by showing the manner in which defendants transacted their business, the ordinary channels through which purchases and sales would be made, and the records in which, in the ordinary course of business, the defendants' sales and purchases would, to some extent, be manifested. It appears that the business of the defendants, with isolated exceptions, was transacted in the Consolidated Exchange. In the ordinary course of business on that exchange, stocks are not delivered by the vendor to the purchaser, but cleared through the clearing house. To this rule it appears there are exceptions; but the exceptions are rare. During a period of some 30 days, beginning when the plaintiff gave his first order to the defendants, it appears that the defendants did not clear a single share of stock through the clearing house, though they represented that during the same period they purchased or sold on the plaintiff's account alone, to say nothing of their other customers, over 7,000 shares of stock. On many other occasions when the accounts show the purchase or sale of stocks on the plaintiff's order the fact is the same; the clearing house shows no transaction to have been made by the defendants on the exchange. There are also about 80 other days upon which the records of the clearing house show that the defendants did not clear as many shares in their entire business for the day as they have assumed to charge against the plaintiff alone. On many other occasions when the plaintiff was charged with purchases or sales of some particular stock the official reports of the dealings on the exchange show that no shares of that particular stock were sold on the exchange on that day. It is true, as already stated, that in exceptional instances a transaction in stock might not go through the clearing house, nor appear in the report of the sales made on the exchange. If it appeared that only a few of the defendants' transactions failed to be reported or cleared, it may well be that no presumption of wrongdoing would be raised

by that fact. But in this case the failure of the transactions to be either cleared or reported is continuous, and we are therefore justified in concluding that this resulted, not from accident or error, but from the fact that the transactions did not really occur. To this is added the fact that neither the defendants on the stand nor the defendants' books disclosed the name of the parties with whom they dealt. The absence of the entry of such information on their books might well cast suspicion on the truth of the defendants' statements. The defendants explained, or sought to explain, these incriminating facts by showing how, in the course of business, their transactions might neither be cleared nor appear in the report of sales on the exchange. Of the sufficiency of this explanation the jury was the judge, and it has found against the defendants on the issue. The charge of the trial court was eminently fair, and without intimation of any opinion on the facts of the case. We cannot set aside a verdict rendered on such evidence.

Several exceptions were taken during the trial to the admission or exclusion of evidence, some of which require notice. The records of the clearing house were sufficiently proved, and properly received in evidence. It is conceded that clearing-house sheets were transmitted to the clearing house daily by the brokers who had bought or sold on the exchange. These sheets were destroyed at the end of the next month after their receipt. Manley, the clearing-house clerk, who made the entries in the clearing-house books, testified to their accuracy, and that he made them from the clearing-house sheets themselves. We think, on the proof of the destruction of the clearing-house sheets, this made the records or ledgers of the clearing house competent evidence.

As to the admissibility of the official reports of sales on the exchange, the question is more doubtful. In Whelan v. Lynch, 60 N. Y. 469, it was held that a price current list, taken from a newspaper, aside from any explanation as to the authority from which it was obtained, was not legitimate evidence of the facts stated. The court distinguished the case then before it from those of Lush v. Druse, 4 Wend. 313, Terry v. McNeil, 58 Barb. 241, and Cliquot's Champagne, 3 Wall. 117; but it did not assume to overrule those authorities. I think the decision proceeded on the sole ground that the authority or source from which the information stated in the price current list was obtained was not shown. In the case before us it appears that these reports are compiled by employés of the exchange, who are stationed on its floor to witness the purchases and sales there made, and record the same. These records, made in the form of reports, are daily published, and given to the members of the exchange for their information. The defendants were members of the exchange, and the reports are in the nature of entries on the books of the association. But further it appears that these reports were daily posted in the office of the defendants for the information and guidance of the customers who might deal through them. They were thus accredited by the action of the defendants themselves, and we think such action was in the nature of an admission that the re-

ports were prima facie correct statements of the transactions represented by them to have taken place.

So far as the defendants' requests to charge which were refused by the court relate to the rule of damages or the question of fraud, they have been disposed of by what we have already written. The court was asked to charge that the defendants were under no legal obligation to give the plaintiff the names of the parties to whom they sold or from whom they purchased stock, and that no presumption against the good faith or honesty of the defendants' dealing could be drawn from their omission to give the names of such parties after the 30 days during which the clearing-house sheets were preserved, or from the defendants' omission to keep a record of the names of those with whom they dealt on the plaintiff's account. These requests, we think, were properly refused. "It is the duty of an agent, where the business in which he is employed admits of or requires it, to keep regular accounts of all his transactions on behalf of his principal; not only of his payments and disbursements, but also of his receipts; and to render such accounts to his principal at all reasonable times, without any suppression, concealment, or overcharge." Story, Ag. § 203. It appeared by the testimony of defendants' own witnesses, who were also stockbrokers, that their books recorded the names of the parties of whom they purchased or to whom they sold stocks. We would be of the opinion that in a business like that carried on by defendants it would be the duty of a broker to so record the transactions had on behalf of his principal that at any time the principal might be able to examine into the broker's actions, and verify them. So the general term held on the previous appeal. But at most it was a question of fact for the jury to determine whether, in the proper conduct of his business, the defendants should not have kept a record of the names of their vendees and vendors. It cannot be said as matter of law that the defendants were under no obligation to keep such a record, or that their failure to keep the record created no presumption against them.

The court was also asked to charge that, in order to make out his cause of action, the plaintiff must prove that every transaction claimed by the defendants to have been made was fictitious; and also that, to render a verdict in favor of the plaintiff for the sum demanded by him, the jury must be satisfied of the same fact,—that is, that every one of the transactions was fictitious. We think this refusal was right. To make out the plaintiff's cause of action, it was not necessary to prove that every transaction was fictitious, but, if any of them were fictitious, he was entitled to have such transactions rejected from the accounts. Nor, to entitle him to recover the whole sum demanded in the complaint, was it necessary that all the transactions represented by that account should have been unreal. If any of these transactions showed a profit, if such transactions were real, they would not diminish the sum due the plaintiff, but, on the contrary, tend to increase that sum.

On the whole, we are of the opinion that this action was presented by the court to the jury with perfect fairness, that the verdict of the

jury was fully warranted by the evidence, and that no legal error was committed which requires a reversal of the judgment.

The judgment and order appealed from should be affirmed, with costs. All concur.

---

(21 App. Div. 118.)                In re CARTER et al.

(Supreme Court, Appellate Division, Second Department. October 5, 1897.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—EFFECT ON CONTRACTS.
    A general assignment by a corporation for the benefit of its creditors does not per se constitute a breach of its outstanding contracts to do work or perform services for third parties, nor does it amount to a rescission thereof.

2. CONTRACT TO CONSTRUCT VESSEL.—TITLE
    Where a shipbuilder enters into a contract for the construction of a vessel, and payments are, according to its terms, made to him by the other party in installments on account as the work progresses, the title remains in the builder until completion and delivery.

3. ASSIGNMENT FOR BENEFIT OF CREDITORS—PRESENTATION OF CLAIMS.
    Persons holding unliquidated claims against an insolvent corporation, arising out of alleged breaches of a contract for services and of a bond, failed, during a space of several years after the debtor's general assignment for creditors, to have them liquidated; and no claims, as contemplated by the statute, were made and filed by them with the assignee. 1 Rev. St. (Birdseye's Ed.) p. 147, § 26. They then sought to have them determined upon an accounting of the assignee, upon a record insufficient for the purpose,—a course which would hinder and delay other creditors, and eat up the estate with the expense of litigation. Held, that the claims should be rejected, and the claimants remitted to their remedy against the assignor.

Appeal from Kings county court.